Thank you, Your Honors. My name is Francisco Ugarte, and I represent the petitioner William Matias Rauda. I'd like to reserve two minutes for rebuttal. I'm going to help you, but watch the clock, okay? I certainly will. Thank you. The agency made two errors that require this court to remand. First is that the agency ignored potentially dispositive evidence that contradicted the agency's holding. And the second is that the agency denied Mr. Matias' application for subpoena. I'd like to start with the arguments around the Convention Against Torture. Your Honors, the remand is required in this case because the agency ignored two material pieces of evidence, and that constituted legal error. The first is that Dr. Thomas Fordman, an expert witness, testified that it was as certain as the sun rising that Mr. Matias would suffer the same violence that he suffered in El Salvador. And I quote, it's just going to be a repeat of the kind of situation he's experienced in the past. I have a question about how this should play out. You get an expert who everybody seems to say knows a lot about El Salvador, and he comes up with a conclusion that basically decides the issue. He makes a conclusion, a prediction, that's the end of it, that's what's going to happen, that decides the case. Are you saying there's nothing left for the IJ to do at that point? No, Your Honor. Obviously, the other country condition evidence, everything in the record, the judge can consider. But in this case, we don't even need to go to the dispositive issue because the agency ignored that testimony. The agency literally ignored it. Now, we also have... Excuse me, how do we know that the agency ignored that testimony? Well, Cole, Your Honor, discusses what are indicators when an agency ignores evidence. And one of the main indicators is if the agency or IJ fails to address dispositive testimony, expert testimony. And in this case, that's exactly what happened. And Mr. Borman, this is a case involving two incidents of past torture by two different parts of the Salvadoran security forces. One, when he was handcuffed, well, excuse me, tied hands behind his back and beaten by officers. And the second, when he was essentially sequestered by members of the Salvadoran military who had concealed their identities and proceeded to beat him with their rifles. And only after a crowd assembled, essentially yelling for them to stop, did the officers stop. So Dr. Borman is an internationally recognized expert. And yes, he did draw that ultimate conclusion. And no, the judge didn't have to honor that conclusion. But the judge ignored that and failed to analyze that. And for that very narrow reason, Your Honor, this case should be remanded for the purpose of the agency actually exploring that. But that wasn't the only... that you rely on that best supports your position on what the IJ was supposed to do with the expert testimony and what happens if he didn't pay attention to it. I believe Cole V. Holder and Castillo V. Barr, and I submitted a 28-J letter that was decided about two months ago, where a case analogous to this case, the agency ignored and distinguished Dr. Borman's testimony improperly. And this court remanded because it needed to... it should not have minimized Dr. Borman's testimony. But that's not the only evidence, Your Honor, that was ignored in this case. The basis for the IJ's decision denying Mr. Matias relief is that Mr. Matias testified credibly that he did not intend to join a gang if he was deported. But his testimony did not say that. His testimony stated that if he was threatened to participate in the MS-13, he would. Your Honor, if there's past torture, there is essentially a presumption of future torture. There's not a regulatory presumption, but this court has held repeatedly that where there's past torture, there's a presumption of future torture. That's in the asylum institution. We don't have that presumption as a cap relief. Your Honor, you're absolutely right. It's not in this case that says that we have to apply that presumption. Nuru, Your Honor, says that when a person has been tortured in the past, it is likely that that person will be... I'm sorry, I don't have the exact quote in front of me right now, but it's not really a contested determination. This court has repeatedly held that where there's past torture, there will be future torture unless circumstances change significantly. Or he can go to a different part of the country. Or unless they can relocate, correct? Correct. But so the material change in circumstance that the judge held here was that Mr. Matias had a subjective intent not to join a gang. That was not a changed circumstance, Your Honor, because Mr. Matias never wanted to voluntarily participate in the gang. In fact, he said he was a slave to the gang. I did not want to get involved with gangs. And he was acting under duress after the gangs threatened him, threatened to kill him. And so for that reason, again, the agency... We don't have to go to the substantial evidence in this case because the agency ignored that testimony. They cited to it, but they cited to it for the proposition that he would not engage in criminal behavior if he were removed to El Salvador. I can see that this may not have been a model situation here, but as I believe Judge Rustani pointed out here, you've got an expert essentially deciding what the judge's function would normally be, making a determination. And the judge said he'd look at the totality of the evidence and came to a different conclusion. What is your best argument that the expert in this case, his testimony compels a different solution? Again, Your Honor, that goes to the substantial evidence, and I believe that the agency ignored that evidence. But in terms of the expert testimony, Nuru and I found the quote, when determining whether it is more likely than not that an individual will be tortured if deported to her home country, past torture is the first factor a court will consider. This is because past conduct frequently tells us much about how an individual or government will behave in the future. It is likely that he will be tortured again if returned to the site of his prior suffering, unless circumstances or conditions have changed significantly. That's Nuru. And I think that... Forgive me. Do you want to save your time for rebuttal? You're done under two minutes. It's up to you. You don't have to. I'll save my time for rebuttal. Thank you. Very well. Okay. Ms. Juarez, you represent the government. Good morning, Your Honors. May it please the Court, Anna Juarez for the Respondent Attorney General. To respond to my colleague's arguments, in this case, the agency did consider all of the evidence with respect to the CAT claim. The immigration judge explicitly stated that he was considering all evidence, even if he did not mention it. And the Board adopted and affirmed, agreed with the immigration judge, and even noted that it was considering the petitioner's testimony, Dr. Borman's testimony, the record evidence. And as Your Honors have pointed out, the expert testimony was considered, and he testified regarding country conditions and his opinion of what would happen. However, the agency considered everything, including the documentary evidence. And while reasonable minds may differ, the standard is whether the record compels the conclusion that petitioner would receive the type of harm that would rise to the level of torture. The agency also properly considered past torture. The immigration judge explicitly stated that due to his young age, it was considering that the two incidents rise to the level of torture, the two beatings. And then the immigration judge went on and considered both that he testified at least twice that he didn't intend to engage with the gangs anymore. He did, again, state a third time that he might have to if forced to, but he also stated that he wouldn't. The agency considered that and the fact that he's now an adult. So even considering Dr. Borman's testimony, the agency recognized that he could be subject to increased scrutiny due to his past gang behavior, his possible, you know, his possible affiliation now, but found that the record just didn't show that he would be harmed to the level that qualifies as torture under the law. Counsel, what is your best argument that the agency did, in fact, consider the expert testimony in this case? As you know, your opponent suggests that it was completely ignored. I understand you to say that you didn't have to specifically refer to him. He just referred to the fact that all the evidence was considered. Would you address that further, please? Yes, Your Honor. In Chavez, which is a 2018 case, it's unpublished. We cited it in our case. A petitioner raised a similar argument that Dr. Borman had testified and the agency didn't address his specific testimony. And the court in that unpublished case stated that that wasn't an error. The agency doesn't need to address each form of testimony here. The agency stated that it considered everything. The board acknowledged his testimony. It didn't go into explicit details about every piece of evidence that it was looking at. But in general, the court assumes that it has. And here there, he did testify, you know, regarding current conditions. There's a lot of record evidence that shows that potential gang members are looked at with scrutiny. However, the record just doesn't compel the conclusion that this petitioner would be tortured. You say that this expert testimony was the key evidence for the petitioner? Petitioner relies a lot on, as Your Honor pointed out, his conclusions that sure as the sun would rise, that he would be tortured. However, as Your Honor pointed out, these are conclusions that the agency is tasked to find, and the agency didn't find that. So I think it's petitioner's strongest argument and evidence, these conclusions that the expert came up with. However, I don't think it's necessarily, I think it's equal to other record evidence. The State Department country reports that are in the evidence as well, that are in the record as well. And I'm happy to answer more questions about the Convention Against Torture claim, or I can address petitioner's other claims. Whatever you like. You can run your case however you like. The government's position is that petitioner did not establish that the record compels the reversal of the determination regarding the Convention Against Torture. And to address petitioner's other arguments, he's never specifically challenged the agency's finding of alienage and admissibility. He didn't contest the I-213, really, and the finding of alienage until his reply brief. He raised questions regarding the egregiousness of the officer's arrest. But as we argued in our brief, it was not an egregious violation, and the agency made a reasonable determination in that regard. Why was the eruption of the ICE agents into his house not an egregious violation? They had consent. According to the I-213, a resident of the house allowed them into their home. And they had asked in the I-213, it states that they asked a resident of the home three different times. She said that she consented. There's never been any evidence to the contrary. No affidavit, no testimony by her. No one has ever explicitly contested that there was consent for them to be in the home. And then the I-213 also states that the bedroom door was opened by another resident who was in the bedroom. Petitioner's main argument is that guns were drawn. However, as the immigration judge recognized during the proceedings, these ICE officers were arresting someone who was convicted of a conviction where he shot multiple people. He also at that time had an arrest for having bullets and for domestic abuse violation. And as the immigration judge pointed out, it would be reasonable under those circumstances for law enforcement officers to have weapons as they're arresting someone in a dark room with that sort of background. What's your take on what happened with the pointing of the gun at the son? I agree that that would be alarming for the family in the room. There's no disputing that. But under the circumstances, it's not an egregious violation. Petitioner himself had stated that the bedroom was dark and the officers were there to arrest him. They got the rest. It played out. They got the petitioner out. They then arrested him. He resisted arrest. They got him out of the house. And he eventually, at an ICE office, admitted alienage. The way I understood it, the child yelled something and the officer turned and pointed his gun briefly. I suppose one can assume that when he saw it was not a threat, he turned the other way. One would assume, yes, Your Honor. That's just an assumption I'm making. What I read was that he heard a sound and pointed the gun in that direction. Yes, Your Honor. And in that regard, the government also argues that there was no abuse of discretion in denying the subpoena, having found that suppression was not warranted in this case. And unless there are any further questions by the court? Any questions by my colleague? Hearing none, then we thank you very much for your argument, Ms. Juarez. Mr. Ugarte, you have a little bit of time left for rebuttal. Would you like to proceed? I will try to be brief. Your Honor, in addition to Nuru, the case Abindanyo-Hernandez in 2015 held that if an individual has been tortured and has escaped to another country, it's likely he will be tortured again if returned to the site of his prior suffering. Your Honor, Dr. Borman's testimony was not whimsical. It was based on the totality of evidence, including the fact that the Salvadoran security forces have killed 1,089 suspected gang members over a two-week period. A catch-all phrase that the immigration court has considered testimony is insufficient where that phrase directly rebuts the thrust of the evidence and the expert testimony. As to the subpoena, Your Honor, the issue of consent was contested in I-213. Mr. Matias was asleep when his wife opened the door. The ICE agents had guns drawn. The ICE agents did not state in I-213 that their guns were drawn. The regulations say that use of a threat to induce someone to waive their rights is a regulatory violation. At a minimum, we should have been entitled to testimony of the officer to justify their entry because once we've established a warrantless entry, ICE has the obligation to justify its entry. The burden shifts. How did you get around the fact that the wife allowed the agents to come into the house? The mother-in-law permitted the agents to come into the house. According to I-213, we are contesting that based on the omissions in the report that the ICE agents drew their guns. The ICE did not mention that. In terms of the consent, while I-213 is inherently reliable, under Murphy, where we present evidence contradicting those statements, that hearsay evidence is no longer reliable. There should have been, at a minimum, our ability to discover information. There was a declaration that they had their guns drawn when they elicited consent? No, but the declaration did say that when Mr. Matias left the room, guns were pointed at him. In terms of his waiver of his right to be safe in his home, his privacy interest in his room, that would have violated regulations pointing a gun at him and his child to get him to leave the room, certainly. And so, that, of course, is egregious. I mean, of course we would argue that would be an egregious violation. Other questions by my colleague? We've gone over our time here, but my colleague can ask as many questions as they like, of course. Thanks. Any additional ones? No, thank you. Very well, thanks to both counsel for your argument in this case. The case of Matias Vahouda v. Barr is submitted.
judges: Bea, M. Smith, Restani